Wise *v.* Fuller.

ANNA WISE

*v.*

LEVI A. FULLER.

| 29 | 257 |
|----|-----|
| 52L | 55 |
| 52L | 148 |
| 29 | 257 |
| 55 | 715 |
| 29 | 257 |
| 58 | 220 |
| f58 | 341 |
| 29 | 257 |
| 59 | 127 |
| 59 | 645 |

1. In general an actionable misrepresentation consists in a false statement respecting a fact material to the contract, and which is influential in producing it.

2. Statements of mere matters of opinion or judgment, although known to be false, do not constitute fraud in the absence of relations of trust and confidence.

3. But a statement that a greater rent is received than is in truth reserved, or that the income from a property is greater than it is in fact, being matters peculiarily within the vendor's knowledge, are fraudulent representations for which an action will lie.

4. To make the promise of a grantee to pay a mortgage on land conveyed to him, available to the mortgagee, it must be made to a person personally liable for the mortgage debt.

5. In the construction of a contract, the intention of the parties, as ascertained by the canons of construction, must prevail, unless indispensable artificial terms have been omitted, or the parties have attempted to do something in contravention of established principles.

6. Ordinarily the relative in a sentence refers to all the antecedents, but, in order to make sense or to give effect to the intention of the parties, it may be referred to one, or to all, or to part.

17

7. A first lien, which has been paid by a person personally liable for the payment of it and a second, though he pays the first through a third person who holds it for him, will, in equity, be considered satisfied in adjusting priorities.

On final hearing on bill, answer and proofs.

*Mr. William J. Magie,* for complainant.

*Mr. Robert Gilchrist,* for defendant.

THE VICE-CHANCELLOR.

This is an ordinary foreclosure suit. The point chiefly contested on the hearing was whether the complainant was entitled to a decree for deficiency against the defendant, Levi A. Fuller. His liability grows out of a covenant contained in a deed made to him for the mortgaged premises by Daniel Fuller. No question was raised as to the sufficiency of his covenant, nor was it disputed that he accepted the deed with full knowledge of its presence. He says there was no previous agreement that he should assume the payment of the mortgage, but he admits he read the covenant when the deed was presented for delivery, and accepted it without objection. This amounted to an express assent. On the papers his liability is indisputable. His defence embraces two grounds: First, that he was inveigled into the purchase by fraud; and, second, that his covenant was made to a person not personally liable for the mortgage debt. The last is not set up in his answer, but, inasmuch as it is presented by a deed put in evidence by the complainant, and which was an indispensable part of his proof, it is impossible to determine whether or not the complainant is entitled to the relief he seeks, without passing upon it.

The mortgage in suit was made May 1st, 1872, by Charles Wise to the complainant, to secure the payment of $8,000 on the 1st day of February, 1875, with interest, payable semi-annually. On the same day Charles Wise, the mort-

Wise *v.* Fuller.

gagor, conveyed the mortgaged premises to James C. Freeman, who, November 1st, 1872, conveyed them to Ogden L. Alden, and he, May 24th, 1873, conveyed them to Daniel Fuller, and, on the 29th day of September, 1873, he conveyed them to the defendant, Levi A. Fuller. Each of the grantees, except Freeman, it is admitted, bound himself in due form to pay the complainant's mortgage.

The last deed, it is alleged, so far as its terms attempt to create a liability against the defendant, is rendered nugatory by the fraud of the grantor. The grantor and grantee are brothers. The defendant is a member of the New York bar, and Daniel, at the time of this transaction, was a real estate broker. The defendant charges that he was entrapped into making this covenant by a course of deceitful representations extending over a period of three months. He says, Daniel and he were in the habit of mutually assisting each other, and dealing on a basis of the most perfect confidence; that in all real estate transactions he trusted Daniel's judgment implicitly, and this Daniel knew; that immediately after Daniel got title to this property he commenced extolling it, stating that it was much better than he supposed it was when he purchased; that it was the best property he had; that in ordinary times its rental value would be $2,000 a year, and it had so many substantial merits that he wanted to leave it, when he died, for the support of his family, as it could be depended upon to produce an income of $2,000 a year. He further says, Daniel told him, in July, 1873, he had had an offer of $1,500 a year rent for it, but considered it no price, and expressed fear if he let it for that sum its market value would be injured. He also says, Daniel stated to him, at this time, that he did not feel at liberty to refuse this offer without first consulting him, as he owed him so much money; and that he replied, he must exercise his own judgment in the matter, and thereupon Daniel said he would decline the offer. He further says, Daniel afterwards came to him and stated he was compelled to raise some money by the sale of something, and then

offered to sell him the mortgaged premises in payment of what he owed him; he says he at first declined, stating he did not want to make anything out of Daniel, and was satisfied to let his debt remain unsecured; that Daniel again said he must raise some money, and if the defendant did not take the property, he would offer it to somebody else; he says he then asked for time for consideration, but Daniel said no, he must make up his mind at once, that he had told him all about the property, and he did not need time for consideration. He says, he then said he would take it, and the deed was delivered the next day by Mr. John S. De Hart, who married the sister of the two brothers.

At this time Daniel was deeply in debt, one or more suits were pending against him, and he shortly after became insolvent. The defendant's entire payment consisted in the surrender of notes he held against Daniel. No money passed. The defendant was present when Daniel purchased the mortgaged premises; he knew what they were valued at then, and what Daniel gave in exchange for them. He exhibited the property Daniel exchanged for them, and drew the contract between the parties. In this exchange they were valued at $20,000. Shortly after Daniel got title, in consequence of his being too sick to go himself, he sent his brother, Dr. Austin B. Fuller, and Mr. John S. De Hart, to Elizabeth, where the property is located, to examine it and ascertain its value. Austin swears, after the examination had been completed, and during the summer of 1873, he told the defendant that Mr. De Hart and he were pleased with the property, and considered it richly worth all Daniel had paid for it. Mr. De Hart says, he obtained the judgment of two or three persons residing in Elizabeth upon its value, and reported to Daniel, but not to the defendant. Mr. Jesse D. Price, a real estate broker, who had charge of the property for Daniel after his purchase, says the defendant, prior to his purchase, applied to him two or three times for an opinion upon its value, but he refused to give it, say-

Wise *v.* Fuller.

ing to him, he was suprised he did not go out and make a personal examination.

The defendant swears, in December, 1873, he offered to reconvey the property to Daniel and lose the consideration he had surrendered, but his offer was declined. The defendant paid the interest on the mortgage falling due February 1st, 1874, although he says he was then somewhat disquieted about the transaction. He says, he first suspected he had been defrauded in June, 1874, and in the following August he notified the complainant of his determination to repudiate the contract. Before this time he had been negotiating with the complainant to accept a less sum than the principal in payment of the mortgage. Daniel has contradicted most of the material facts sworn to by the defendant, but the force of his evidence is greatly impaired by his hatred of his brother, which he endeavored to make painfully conspicuous during his examination. There can be no doubt, in view of the evidence upon the subject of value, that both the defendant and Daniel paid much more for the property than it was intrinsically worth, but it is equally clear that the reports made to Daniel by his brother and Mr. De Hart fully justified him in believing it was worth all he had given for it.

The complainant is seeking to enforce a purely derivative or substituted right. He stands here merely in the right of his debtor, and unless his debtor could enforce this covenant, he cannot. If Daniel could not hold the defendant, had he paid the complainant's debt and were here seeking a decree, the complainant cannot. *Klapworth* v. *Dressler*, 2 *Beas.* 62; *Crowell* v. *Currier*, 12 *C. E. Gr.* 152; *S. C. on appeal, Ib.* 650. The question, therefore, on this branch of the case is, Does the proof show that the defendant's covenant was procured by fraud? On the papers the complainant has a perfect case, and, unless their force as the mutual repository of the intention of the parties has been overcome by convincing proof, they must stand as the infallible arbiter of their rights and liabilities.

No definition of fraud can be framed which will serve as a safe test in every case. The best effort in that direction must prove abortive. Each case must be determined on its own peculiar facts. It is not every untruthful statement that will invalidate a contract. Avarice is so strong in the average man that he naturally extols what he desires to sell, and depreciates what he wants to buy. All bargaining is conducted on the principle that each party is at liberty to get such advantages in the transaction as are allowed by the morals of trade. A contract is rarely made where each party strives to give the other all the benefit to be derived from the transaction. Gain or profit is the fundamental object of all traffic. Generally, mere expressions of opinion, estimate or judgment, even if false, do not constitute fraud. It may be said, generally, an actionable misrepresentation consists in a false statement respecting a fact material to the contract, and which is influential in producing it. 2 *Chit. on Con.* 1044; 2 *Pars. on Con.* 275; *Taylor* v. *Fleet*, 1 *Barb.* 471. Statements of value made by a vendor during the negotiation between the parties, although known to be excessive, do not ordinarily constitute a warranty or a fraud. *Uhler* v. *Semple*, 5 *C. E. Gr.* 291. A mere expression of opinion as to value, although the amount stated is known to be excessive, is not a fraud (*Sandford* v. *Hardy*, 23 *Wend.* 260; *Smith* v. *Countryman*, 30 *N. Y.* 655, 681), unless the person making it knew at the time that in consequence of the relations of trust and confidence existing between himself and the person to whom it was made, he would rely upon it and be controlled by it. *Story's Eq. Jur.* § 197. A purchaser is not entitled to relief against a vendor for a false affirmation of value, it being deemed his own folly to credit a nude assertion of that nature. Besides, value consists in judgment and estimation, in which men necessarily differ. 1 *Sugd. on Vend.* 3. But a remedy will lie against a vendor for falsely affirming that a greater rent is paid for the estate than is actually reserved, for that is a fact within his own knowledge. *Ib.* 5; *Lysney* v. *Selby*, 2 *Ld. Raym.* 1118;

*Dobell* v. *Stevens*, 3 *B. & C.* 623. And so a willful misrepresentation by a vendor affirming that the income from his public house has been greater than in truth it was, is an actionable fraud. *Bowring* v. *Stevens*, 2 *Car. & P.* 337. The fact that a price in excess of its market value is paid for a thing, standing alone, is never evidence of fraud. Mere inadequacy of consideration will never substantiate a charge of fraud. In equity, inadequacy of value is, in general, of itself, no ground for impeaching a contract (*Beninger* v. *Corwin*, 4 *Zab.* 257, 259); but, with other circumstances of suspicion, it may constitute an element of proof in establishing fraud. 2 *Chit. on Con.* 1050.

Tested by these rules, I think the defence is narrowed down to this question : Did Daniel, with a view of enticing the defendant to purchase, falsely represent that he had had an offer of $1,500 a year for this property? The other statements attributed to him, even if they were couched in language as strong as that in which they have been put before the court, related entirely to the prospective · value and merits of the property, and could only have been regarded as the extravagant praise of a loquacious boaster. They were not the sort of representations that would be likely to influence the judgment of a man of mature age, whose active years had been spent in the courts of a great city; who was necessarily a man of affairs, and knew thoroughly the man who uttered them. Besides, it is impossible to say Daniel did not honestly entertain the opinion he expressed. He had sent his brother and Mr. De Hart to ascertain the truth about the property, and he had a right to rely upon what they said. Their information was communicated to the defendant as well as to Daniel. It is not pretended that Daniel made a representation which was at variance with the facts as they were reported to him. Nor have I been able to discover any motive for the fraudulent purpose imputed to Daniel.

At the time these conversations occurred, the relations existing between the parties were kind and affectionate; the

defendant had, for a long time prior, been in the habit of loaning Daniel money without stint, and, if his statements are true, he was an unusually indulgent creditor. When Daniel first offered him the property, he says, he told him to keep it, he was willing to let his debt remain unsecured. Daniel's obligations, he says, he knew were rapidly maturing. Daniel says he was in sore pecuniary distress and his brother knew it. The result proved he was insolvent. I can understand why at such a juncture he should be anxious to secure such a creditor; but he could not have been willing to defraud him, unless he was insensible to the claims of affection and gratitude. I am not willing to believe any man so basely mean and corrupt in the absence of convincing proof. Nor do I think any special trust or confidence has been shown. Aside from the fact that the parties were brothers and occupied the same office, there is no proof of confidential relations except a positive affirmation on one side and an emphatic denial on the other. The defendant was not a callow youth, nor a recluse, and Daniel's career as a real estate dealer had scarcely been sufficiently successful to inspire a blind confidence. From my observation of the two men, I think it is quite apparent the defendant, in mental power and resources, is much the superior of his brother. The strong do not usually rely upon the weak. This was not his first venture in real estate. He had purchased a farm in 1866, a share in a real estate association in 1868, and had also been the owner of three houses and lots in the city of Brooklyn. But the decisive evidence on this point, in my judgment, is the fact that he knew at what valuation Daniel had taken this property, what he had given in exchange for it, whom he had sent to learn its value, and what report they had made. These facts completely refute the charge that this purchase was the result of an unquestioning faith in the correctness of Daniel's judgment upon the subject of value.

But did Daniel, with design to influence the defendant to purchase, falsely represent that he had had an

offer of $1,500 a year for the property? No deceit or mis-
representations as to past productive value is charged. It
is not alleged that anything was said respecting the past or
present rent of the property. It appears Daniel's agent had
reported to him that an inquiry had been made respecting
the rent of the property; to quote the agent's language, he
told Daniel he had had a "nibble." The deceit charged
against Daniel is in falsely representing this inquiry as an
offer, and then making it a pretence for seeking the defend-
ant's advice whether he should accept it or not. Daniel
denies that he sought the defendant's advice, but admits
that for a few days he thought he would be able to rent the
property for $2,000, and spoke of his prospect freely, and
when it failed he spoke as freely of his disappointment.
This occurred in July, 1873, two months before the defend-
ant purchased. Now, granting that Daniel said all the
defendant imputes to him, the defendant knew perfectly
well the property was not let for any such rent when
Daniel got it, nor when it was conveyed to him. He had
no reason to believe, at any time, it had ever been rented
for any such sum; on the contrary, he had notice, in the fact
that it had been conveyed from one grantee to another,
heavily burdened with assessments and taxes, that it had
been either unproductive, or nearly so, or in very improvi-
dent hands. He says he purchased under the belief that its
chief value consisted in its capacity to be used as a dock,
but he knew it had not been used for that purpose by
Daniel, and it is not pretended that any representation was
made that its use for that purpose, by any previous owner,
had been at all equivalent in profit to its estimated value.
No allusion was made to this offer in the final interview,
and there is nothing in the evidence to show that either
party thought of it then; indeed, it would seem, from the
silence of the parties, that the subject had passed from the
memory of both, or that the vendee knew quite as well as
the vendor that the nibble had never become a bite. In
view of all the circumstances, I do not believe the defend-

Wise v. Fuller.

ant's action was influenced in the slightest degree by what
Daniel said respecting this offer. Fraud is so odious to
justice that the courts should always be swift to denounce
it, and to give relief against it, but they can only proceed
upon proof. The law benignly presumes all men honest
until the contrary is shown. He who charges fraud must
prove it or fail. His proof must satisfy the conscience of
the court. I am compelled to declare, after a careful con-
sideration of this branch of the case, I am not convinced the
defendant was induced by fraud to accept the deed contain-
ing the covenant upon which the complainant seeks to
hold him.

The other defence raises simply a question of construc-
tion. Charles Wise conveyed the mortgaged premises to
James C. Freeman, subject to complainant's mortgage and
certain assessments for local improvements. After referring
to a prior conveyance, the deed says: The premises " are
hereby conveyed subject to a mortgage from Charles Wise
to Anna Wise, for $8,000, and subject also to all city assess-
ments now existing thereon, which the said party of the
second part hereby assumes to pay, except the assessment
for the Reid street sewer."

The defendant contends that the relative or representa-
tive in this sentence refers to the last antecedent only, and
that by the proper construction of the stipulation, the cove-
nantor bound himself simply to pay the assessments and not
the mortgage. There can be no doubt, if this reading be
the true one, the promise of the defendant is without legal
force, for it is well settled, to make a promise of this
nature effective, it must be made to a person personally
liable, legally or equitably, for the mortgage debt, and
if there is a break anywhere in the chain of liability, all
the subsequent promises are without obligation. *King* v.
*Whitely*, 10 *Paige* 465; *Trotter* v. *Hughes*, 12 *N. Y.* 74; *Crow-
ell* v. *Currier*, 12 *C. E. Gr.* 152, 155; *S. C. on appeal*, *Ib.* 650.
But this construction cannot prevail. It does not read the
sentence correctly. It requires it to be read in a restricted

sense, and deprives the principal word of its full import. It manifestly runs counter to the plain intention of the parties. There can be no doubt about what that was. Unless artificial terms are requisite, or the parties have attempted to do something contrary to established principles, their intention, if it can be clearly seen, must prevail over everything. The object of all canons of construction is to ascertain the meaning of the parties, and when that is plain there is no room for construction, and the court has no duty but to give effect to it. The relative may be referred to such antecedent as will render the clause sensible, although it is not the last (*King* v. *Wright*, 1 *Adol. & El.* 434); or it may be referred to all the antecedents, or to such of them as will make sense. (*Pot. Dwar. on Stat.* 210). In all cases of construction the clause presented for interpretation is, if possible, to be rendered sensible and reasonable, and effect given to all its parts. I think it is clear that Mr. Freeman intended to assume the payment of the complainant's mortgage, and that he has manifested that intention by appropriate language. In my opinion the complainant is entitled to a decree for deficiency against Mr. Levi A. Fuller.

This result renders unnecessary discussion of the question whether the complainant's mortgage or the taxes and assessments paid by Mr. John S. De Hart are entitled to priority in payment. It is admitted the taxes and assessments were paid by Mr. De Hart as the agent of Mr. Fuller, with his money and for his benefit. The right and interest transferred by the city to Mr. De Hart is held by him in trust for Mr. Fuller. Mr. Fuller bound himself to pay the taxes and assessments. His covenant embraced them. As between his covenantee and those standing in his rights, and his trustee or himself, the taxes and assessments must be considered paid. This would be so, even at law. *Allaire* v. *Hartshorne*, 1 *Zab.* 665, 670. Equity looks at things as they are, and deals with them regardless of mere forms or appearances. The complainant's lien stands first in order of priority.