## FRANK LYNWOOD GARRISON

### v.

### TECHNIC ELECTRICAL WORKS et al.

A contract for the purchase of shares of the unissued capital stock of a corporation was obtained to be made with the company by the fraudulent statements of its president, secretary and treasurer, in the conduct of the company's business. On this contract the company issued the stock and received the purchase-money. On bill filed by the purchaser against the officers and the company to abrogate the contract because of the fraud and for the restoration of the price paid, the company cannot retain the money paid and defend by denying that it authorized or knew of the fraudulent statements. To do full equity, it must also return the money obtained by the fraud.

---

On bill and demurrer.

This bill is filed by Frank Lynwood Garrison, complainant, against George M. Sinclair, John J. Zimmele and the Technic

Electrical Works, defendants.   The complainant states that the
Technic Electrical Works was duly incorporated under the laws
of New Jersey, on July 14th, 1893 ; that the object of the in-
corporation was the manufacture and repair of electrical and
other machinery.   The company commenced business in the
month of September, 1895.   In February 1895, the defendant
Sinclair had been secretary and treasurer of the company for a
month, and the defendant Zimmele was at the same time a stock-
holder and president and manager of the corporation.   Sinclair
requested the complainant to purchase of him fifty shares of the
stock at $40 per share, and twenty shares of the treasury stock
of the corporation ; and it was represented to the complainant
by Sinclair and Zimmele, principally the former, that the com-
pany was in a solvent condition, and that its collectible assets
were in excess of its liabilities, counting the capital stock issued
as part of the liabilities.   They exhibited to the complainant a
balance sheet of the condition of the company, which they stated
was true; and they further stated that the receipts from sales
of its manufactured commodity were in excess of its expendi-
tures ; that it was then doing a profitable business, and with a
small additional capital and attention, such as the complainant
could give, it would make money and become prosperous ; and
that if the complainant would purchase the stock, he should be
elected an officer of the company and receive a salary of $25 per
week for his services as such officer.

Relying on these statements, the complainant agreed to pur-
chase fifty shares of the capital stock of the company, belonging
to Sinclair, for $2,000, and twenty shares of the treasury stock
of the company for $1,000 cash, to be at once paid to the treas-
urer of the company.   The $2,000 to be paid to Sinclair to be
one-half cash and one-half by due-bill of the complainant.

On March 2d, 1896, Sinclair and Zimmele gave the complain-
ant a memorandum of the agreement, which, however, contained
no mention of the office and salaries to be bestowed as above
stated, and, by the memorandum of agreement, Sinclair and
Zimmele pledged their word that the assets and liabilities of
the corporation, as stated in trial-balance sheet of February

1st, 1896, submitted to the complainant at that time, and their statement as to the solvency, credit and condition of the corporation were true, as the memorandum, a copy of which is annexed to the bill, will show.

On March 5th, 1896, the complainant paid Sinclair, under the agreement, $1,000 in cash, and gave him a due-bill for $1,000, and on the same day he paid into the treasury of the company $1,000. The complainant received by transfer from Sinclair fifty shares of stock, and from the company twenty shares of stock, and from Zimmele twenty additional shares of stock, making in all ninety shares, and was thereupon elected president of the company in place of Zimmele, and placed in the management of its affairs and business, and given power to control the disbursements of the company by regulation that all the checks of the treasurer should be countersigned by the complainant as president. Zimmele was made secretary and treasurer of the corporation, in the place and stead of Sinclair.

There are one hundred and thirty-seven shares of the stock of the company held by other persons than the complainant, the principal part of which was held by Sinclair and Zimmele, although the complainant is the largest individual holder of the stock, and Sinclair is the next largest holder. The company does not own any real estate. Its manufactory and works are rented in the city of Philadelphia.

The complainant states, in his bill of complaint, that shortly after he took charge he ascertained that the balance sheet of February 1st, 1896, was inaccurate in several particulars. Bills payable, to the amount of over $400, were admitted by Sinclair to have been omitted from that item on the balance sheet. The inventory of the plant and tools, stated as assets, had been made up over a year prior to that time, and no allowance had been made for depreciation. . The item "accounts receivable" had been represented to the complainant to be collectible to the extent of two-thirds, but the complainant found that less than one-half was collectible. The balance sheet was in every respect incorrect and misleading. About the end of March the complainant was paid three weeks' salary at the rate

of $25 per week, and the complainant ascertained that notwithstanding the additional capital which had come into the treasury by reason of Sinclair taking stock for a part of the account which he held against the company, the company was yet in financial difficulties. The complainant then made a thorough examination of the financial condition of the company, and ascertained that its assets then were, and for over two years prior thereto had been, insufficient to pay its debts and continue its business; that its expenditures for the previous five months had been in excess of its receipts, without any corresponding increase in the assets; that its business for the previous five months had been unprofitable; that the company had been for over two months, and at the time of the statement made to the complainant, was, insolvent, and unable to pay its liabilities without suspending its business.

The complainant charges that the mistake, in fact, made by him as to the condition of the company, which led him to invest his $1,000 in the company, was entirely due to the misstatements, misrepresentations and concealment of the condition of the company made by Sinclair and Zimmele; that it arose from no want of care or omission of legal duty on the part of the complainant. The complainant refused to pay the due-bill of $1,000, which fell due on the 1st of April, 1896, and proposed to Zimmele that the company should go into liquidation, and Zimmele at first acceded. The complainant made an application to the circuit court of the United States, in the district of New Jersey, for a decree of insolvency and the appointment of a receiver. The complainant having failed in that application, abandoned his suit and dismissed the bill. Since the futile proceedings in insolvency, the control of the business has been interfered with and the complainant ousted therefrom, the combination of the safe has been changed to prevent his access thereto, and by-laws have been adopted containing provisions for a vice-president, and giving him power to countersign the treasurer's checks, which power theretofore was held exclusively by the president.

Pending the application of insolvency in the United States

court, the company's business was practically suspended and not carried on in a way to be substantially effective, owing to the financial condition of the company. Since that time the business has been carried on by borrowing large sums of money, increasing its liabilities without adding to its assets, and Zimmele and Sinclair are carrying on the business at a heavy loss, consuming the assets of the company, and, in fraud of the complainant, making his stock daily less valuable. The complainant further charges that the company is doing business at a loss, consuming its assets and increasing its liabilities in the regular course of business, and that if it did pay its liabilities there would not be over $1,000 of assets left to be divided among its stockholders, holding capital stock to the amount of $11,350, less the stock held by complainant; and the complainant states if the company is allowed to proceed with its business, these remaining assets will be consumed and nothing left for its stockholders. He further states that since he knew of the insolvency of the company, he took measures to rescind his contract by which he paid $1,000 into the treasury of the company, and is now ready to return to the treasurer of the company and to return to Zimmele the stock that he received from them when he paid $1,000 to the company.

The bill prays answer without oath, and that the defendant may be decreed to pay to the complainant the $1,000 paid by the complainant to the company with interest, upon the complainant delivering up to the company and to Zimmele the forty shares of stock received by him from them, and that on failure a receiver may be appointed to take the assets of the company and sell or dispose of the same for so much as it may be necessary to pay the complainant his said sum of $1,000 and interest, or, if it be more equitable, that the receiver may first pay all other debts of the company than the capital stock and the claim of the complainant, his said sum of $1,000 with interest, provided they be sufficient, and, if they be insufficient therefor, that the balance of the $1,000 be paid by Sinclair and Zimmele or one of them; that an injunction be issued to the company, and Sinclair and Zimmele be restrained from further carrying on the

business of the company and disposing of or meddling with the same &c.

To this bill the defendants, the Technic Electrical Works, Sinclair and Zimmele, demur by joint and several demurrer. They state as the causes of their demurrer—

*First.* That the bill does not contain any statement that the defendant, the Technic Electrical Works, has become insolvent or suspended its business for want of funds to carry on the same, so as to entitle the complainant to a receiver and injunction as prayed for in the bill.

*Second.* That the statement in the bill contained, as to the alleged misrepresentations made by Sinclair and Zimmele as to the financial condition of the company and its prospects, does not show a case to entitle the complainant to any discovery or relief.

*Third.* That even if the representations alleged to have been made were false and fraudulent, they were beyond the scope of the power of the defendants Sinclair and Zimmele as officers of the company, and cannot bind it.

*Fourth.* That if the conduct of the business set out in the bill was the cause of loss, yet that such management and conduct was nothing more than a mistake in judgment on the part of the officers of the company, and does not show a case which entitled the complainant to relief.

*Fifth.* That the complainant has not, by his bill, stated a case which entitled him to either discovery or relief.

*Mr. James H. Carpenter* and *Mr. Herbert A. Drake,* for the complainant.

*Mr. Edwin Robert Walker* and *Mr. Garret D. W. Vroom,* for the demurrants.

GREY, V. C.

The first ground of demurrer is that the bill does not contain any statement that the defendant corporation has become insolvent, or suspended business for want of funds &c., so as to entitle the complainant to a receiver and injunction &c. On the

argument it was assumed that the bill as framed is a proceeding seeking to have the defendant company declared insolvent and this court to appoint a receiver to wind up its affairs. Bills for such a purpose must undoubtedly set out facts which indicate that the financial condition of the company is such that it is, because thereof, compelled to suspend its business. Stopping of its works is not necessarily a suspension "of its ordinary business for want of funds to carry on the same." There are many occasions when the stoppage of production is not only advisable but necessary, and without insolvency. Nor does carrying on business at a loss, or borrowing money, necessarily indicate a condition of insolvency. That the company is able to do these things and still proceed with its business, is rather an indication that its financial credit is good. The bill under consideration, while alleging the company to be insolvent, as a part of the complainant's case to show that its financial standing was misrepresented to him, and with some surplusage, stating subsequent details of its business, does not attack the defendant company in order to declare its insolvency, appoint a receiver and wind up its affairs. No decree that the company is insolvent is prayed for. What the complainant asks is a decree for the return of his money, and a receivership for the purpose of applying the assets of the company to the payment which he seeks; not a preliminary decree of insolvency and a receivership for the purpose of administration, but a receivership, as a final mode of relief, to procure the payment of his own claim. The prayer for injunction to restrain the further conduct of the business of the company, contained in the bill, is evidently also sought as an ultimate remedy in aid of any decree the complainant may obtain for the payment of his claim. Inasmuch as the bill is not one for the administration of the defendant company's assets, because of its insolvency, I think the first ground of demurrer, which criticises it for the lack of the fullness of statement required in such a bill, cannot be sustained.

The second ground of demurrer is that the misrepresentation &c., charged in the bill, as to the financial condition of the company and its prospects, do not show a case to entitle the com-

plainant to discovery or relief.  In examining this objection, misrepresentations, so far as they relate to matters of opinion and judgment as to the happening of future events, as that the company " with a small addition of capital and attention, such as the complainant could give, would make money and become prosperous," cannot be regarded, as it is well settled that such statements, even if false, do not constitute a fraud, if there be no relation of trust or confidence between the parties.  *Wise* v. *Fuller, 2 Stew. Eq. 257; Conlan* v. *Roemmer, 23 Vr. 53.*  Allegations of such statements afford no ground for relief, and are not to be regarded as well pleaded, nor can they be taken as admitted to be true by the demurrer.  But representations made by an owner or his agent to an intending purchaser, at the time of the bargain, descriptive of the existing condition. of the subject-matter of the proposed sale, as to its kind, quality or quantity, stand on a different basis, and, if falsely made to mislead the buyer, they may be the basis for a recovery.  A statement that income from a property is greater than it is, is a fraud for which an action will be supported.  *Wise* v. *Fuller, ubi supra; Crossland* v. *Hall, 6 Stew. Eq. 11.*  So, also, a statement that a property rented for more than in fact it did rent for, was held to avoid a contract of sale.  *Dimmock* v. *Hallett, 2 Ch. App. 28.* The allegations of this character, which the defendants admit by their demurrer, are that Sinclair requested the complainant to purchase shares of stock from him individually, and also from the defendant company ; that Sinclair and Zimmele, during the negotiations for the sale of this stock, exhibited to him a balance sheet which they said was true, and stated that the collective assets were in excess of the company's liabilities, taking capital stock to be a liability ; that the receipts from sales of its products were in excess of its expenditures; that it was then doing a profitable business.  They gave to the complainant a written memorandum, pledging their word that the assets and liabilities of the corporation, stated in the trial-balance sheet of February 1st, 1896, submitted to the complainant, and all their verbal statements as to the solvency, credit and condition of the corporation, were correct and true.  Sinclair was at this time the

secretary and treasurer of the company, and Zimmele was its president. They were, therefore, so related to the company that they knew its financial condition. Relying on the truth of these statements made by these men, whom he knew to be officers of the company, the complainant agreed to purchase fifty shares from Sinclair and twenty from the company, and paid $1,000 in cash to Sinclair and gave his note for the balance, on which Sinclair transferred to him the fifty shares, and the complainant also paid $1,000 to the company for its twenty shares, and accepted the issue of them from the treasury of the company. It is these twenty shares received directly from the company which the complainant now offers to return, and the payment for which he seeks to have refunded to him. Upon the sale of the stock to the complainant being concluded, he was elected president of the company, and then discovered that the balance sheet was not true; that $400 of bills payable had been omitted; that the inventory of plant and tools was made more than a year before, and that no allowance had been made for depreciation; that the item "bills collectible," represented to be collectible to amount of two-thirds value, was, in fact, less than one-half of it collectible; that for over two years prior thereto the assets of the company had been insufficient to pay its debts and continue its business; that its expenditures for the previous five months had been in excess of its receipts, and its business for the same time had been unprofitable, and that the company had been insolvent for over two months and unable to pay its liabilities without suspending its business.

These allegations show that the actual condition of the company varies in substantial particulars, and in matters of existing fact then within the knowledge of the defendants, from the representations alleged to have been made by them which induced the complainant to make the purchase of the company's stock. If true, and on this issue they must be taken to be true, they show that Sinclair and Zimmele, the executive officers of the defendant company and its largest stockholders, being interested to have additional capital put into the company, and knowing its true financial condition, while they were conducting the com-

pany's business in obtaining purchasers of its stock, made false statements indicating a much more favorable financial situation of the company to be the fact than then actually existed, for the purpose of inducing, and thereby actually induced, the complainant to purchase the twenty shares of the treasury stock. In such cases, courts of equity afford relief by canceling the contract, and thus relieving the party injured from its obligation if it be executory, or compelling a restoration of the property obtained by fraud, if it be executed. *Pom. Eq. Jur. 872 et seq.*

I think the second ground of demurrer cannot be sustained.

The third ground of demurrer is that the misrepresentations of Sinclair and Zimmele were beyond the scope of their power as officers of the company, and cannot bind it.

The complainant's allegations in this respect charge that Sinclair, who was the secretary and treasurer, and Zimmele, who was the president of the defendant company, by false and fraudulent representations, induced him to purchase from the company twenty shares of its stock; that the company issued this stock to him and received his money, under this contract into which he was thus induced to enter; that he now finds the statements made to him to have been false, and the value of the stock by reason thereof to have been worthless or nearly so, and he therefore tenders a return of the stock, and asks a decree that the company refund the money. He does not seek to make the company respond in damages for the unauthorized false statements of its affairs, but only to restore the money which the company has received by fraud. The contention of the demurrants amounts to this, that the company may recognize and ratify the acts of its officers whereby it obtained the complainant's money, but that it has no responsibility for the fraudulent misrepresentations which they made to secure it, because it did not expressly authorize the false statements to be made. This contention has had support, in England, in a number of cases arising on subscriptions to stock, and in *Ayres' Case, 25 Beav. 513*, it was declared that misrepresentations by the manager and secretary of a company, by which subscriptions to its stock were obtained, were not chargeable against the company to relieve

·from the subscription because not authorized by the company, the master of the rolls holding that ". any false statement made by an agent of a company, not sanctioned by the company, would not bind it."

The necessary effect of such a declaration is that a corporation may retain the beneficial results of a fraud perpetrated by its officers in the conduct of its business, unless the fraudulent acts are expressly authorized.

In the house of lords, however, the responsibility of a corporation for the fraudulent contrivance of its agents was put upon broader ground. Lord Cranworth declared that the objects of a corporation can only be accomplished through the agency of individuals, and that there could be no doubt that if the agents employed act fraudulently, so that if they had been acting for private employers, the person for whom they were acting would have been affected by their fraud, the same principles must prevail where the principal, under whom the agent acts, is a corporation. *Ranger* v. *Great Western Railroad Co., 5 H. L. Cas. 85.*

As to the validity of contracts of subscription for stock of a corporation, obtained by misrepresentations made by its officers, though there has been considerable conflict in the English cases, the true doctrine on this point is declared to be that, where the person who has been deceived institutes a suit to rescind the contract to purchase shares, the misrepresentations are imputable to the company, and the purchaser cannot be held to his contract. *Western Bank of Scotland* v. *Addie, 1 L. R. App. Cas. (Scotch) 145; Oakes* v. *Turquand, 2 L. R. H. L. Cas. 325.*

It is ,unquestioned law that a corporation must respond for the acts of its agents in the conduct of its business, which are injurious to others, though they may be wholly unauthorized by the corporation, indeed forbidden by it, as in the cases of railroad train operatives, who, while driving trains, injure passengers or travelers of highways, in breach of the company's rules, and the many negligence cases which arise in the conduct of the business of railway, steamboat, ferry and other corporations. These acts are done, perhaps, by day laborers, and are not beneficial to the company or in any way ratified or approved by it.

The company answers for these wrongdoings, because it has put the wrongdoers in its place to do its business, and it must respond for the wrong so done to other persons in the course of its business. I can see no reason why the corporation should not respond, at least, to the extent of restoration, in cases where the officers and agents of the company perpetrate a fraud in the conduct of its business, and thereby induce the making of a contract which the company accepts and executes, and of which it retains the benefit.

The American cases on the liability of corporations for the frauds of their agents committed while in the conduct of their business, assert a jurisdiction quite as extensive for the correction of such wrongs.

If the corporation has clothed the agent with the power to act in its behalf, and receives and accepts the benefits resulting from his agency, then the parties injured by the fraud may resort for redress to the principal. But it is no answer to say the corporation could not authorize an agent to perpetrate a fraud, because if this were so no corporation could be held liable for any acts of its authorized agents, however great the injury to others. *Fogg* v. *Griffin et al., 2 Allen 6*. This liability of the company is stated to attach not on the ground of express authority given by the corporation to its agent to make the statement, but because the corporation cannot act save through its agents, and as to the particular matter the agent stands in the place of the principal, and whatever he does or says about that matter is the act or saying of the principal. *Sharp* v. *Mayor &c. of New York, 40 Barb. 273*. The execution by the corporation of the resulting contract and the retention of its benefits after knowledge of the fraud, is not only a ratification of the contract itself, but also an adoption of the statements of the company's agents whereby the contract was obtained. It is unconscionable that the corporation principal should be permitted to keep the results of a fraud by merely denying the authority of its agents to perpetrate it. *Story Eq. Jur.* § *193 a*.

In the case in hand, whatever may have been the lack of authority of the president, secretary and treasurer of the defend-

ant company to make the misrepresentations which led to the sale, or even to bargain for or issue its stocks, the fact is admitted that the company, on the bargain made · by these officers (who probably comprise all the executive officers), accepted the payment and issued the stock. The company thereby ratified their action and conduct. When the company took the benefits of the fraud, it took with those benefits the responsibility for the fraud which procured them, at least to the extent of an obligation of restoration to the party defrauded. It is no answer to say it did not know of or authorize the fraudulent statements. It knows of them now, and by retaining the money with knowledge, it ratifies their acts and the statements by which the money was obtained. If it disavows the fraud, it has not done full equity until it restores to the injured party the benefits which it received by reason of the fraud. It cannot, in a court 'of equity, in a case where the superior rights of the creditors of the company do not intervene, retain the profit resulting from a fraud done in its behalf, and refuse restoration upon an allegation of its ignorance of the fraudulent acts, or the lack of authority of its officers who acted for it in the conduct of its business in perpetrating the fraud.

In this state, in just such a case, the rule is stated in the broadest terms. If such contracts are induced by fraud, they create no obligation, and the injured party has a right to have them abrogated. *Vreeland* v. *New Jersey Stone Co., 2 Stew. Eq. 189.* In that case the fraud by which the subscription was obtained consisted of a false representation made by a single director in the presence of other directors, at a directors' meeting, but upon which no corporate action whatever was taken. The complainant was held to be entitled to have his contract of subscription abrogated, and a decree for the return of his money not only against the company but also against all the directors who were present, and the court of errors and appeals (*2 Stew. Eq. 651*) unanimously approved the decree. The third ground of demurrer cannot be sustained.

The fourth ground of demurrer is that even if the conduct of the business set out in the bill was the cause of loss and financial.

Garrison v. Technic Electrical Works.

embarrassment to the company, yet that such conduct was only a mistake in judgment on the part of the defendants as officers of the company, and is no ground for the relief prayed for.

This ground of demurrer seems to be based upon the supposition that the complainant seeks to charge the defendants because they mismanaged the company's affairs and thereby caused him a loss. I have already shown that the bill, though not free from surplusage, sufficiently indicates that the ground of complaint is that the defendants, by false statements made to him to the effect that the company's financial condition was of a certain favorable character in details named, induced the complainant to take the company's stock, and he now asks that this contract be abrogated, and that the definite sum of money he paid for the stock be restored to him. The complainant does not ask any remedy against the defendants Sinclair and Zimmele, because of their mismanagement of the general business of the company, though the bill does set out some acts of the defendants which were alleged to have been to the disadvantage of the company. These allegations are surplusage and do not effect the substantial relief sought by the bill. As no relief is sought because of this conduct, it is of no significance whether it arose from mistakes in judgment, or gross negligence, or willful fraud.

The defendants have all demurred generally to the whole bill. The demurrer must be effective as against the bill in all its parts, or it must be overruled. The bill, taking its well-pleaded allegations to be true, exhibits a case where the complainant was induced by false representations to purchase shares of stock which he tenders himself to be ready to return, and prays that the defendants who made the false representations, or received and accepted the benefit of them, may be decreed to refund the money. That the complainant also asks relief by specific methods not applicable in the same suit for the enforcement of such decrees, will not deprive him of his rightful remedy. There is in the bill an exhibition of a right to equitable relief and a prayer for a decree accordingly, and a general demurrer will not be sustained because relief may not be given in one or more special modes which are suggested in the prayer of the bill. In such

46

cases a general demurrer is too broad and must be overruled. *Banta* v. *Moore, 2 McCart. 97; Durling* v. *Hammer, 5 Stew. Eq. 228.*

I will advise that the demurrer be overruled, with costs.