The complainant seeks a decree rescinding the sale by the defendant to the complainant of two chattel mortgages and three promissory notes and directing the return to the complainant of the consideration paid for the transfer. The complainant is concededly a dummy for his father, Alexander Wasserman, and Michael Simons, the persons who provided the money for the purchase of the securities. *Page 353 
The basis for the relief sought is a charge of fraud on the part of the defendant bank. According to the bill, the bank officials and its attorney represented to Simons that the three notes were secured by the chattel mortgages when, in fact, only two of the notes were secured. It is further alleged that the bank's attorney assured Simons that $5,031.70 was due on the mortgages when, in fact, only about $4,100 was due. The bank, of course, denied the charges of fraud.
From the testimony it appears that in the early part of 1946, Nathan Sachs, Milton D. Sachs and Stanton A. Sachs, as partners, were engaged in the business of manufacturing shoes in the City of Paterson under the firm name of Sachs Shoe Manufacturing Company. On May 2d 1946, the partnership borrowed from the Franklin Trust Company of Paterson the sum of $6,500 and a promissory note for that amount payable in one month from its date was executed and delivered to the bank. The note was secured by a chattel mortgage in the sum of $6,500 covering machinery and equipment used in the business of the Sachs Company. On May 31st, 1946, a corporation known as the Sachs Shoe Manufacturing Company was formed. The corporation took over the business and assets of the partnership. On July 18th, 1946, the Sachs Shoe Manufacturing Company borrowed the further sum of $1,300 from the Franklin Trust Company and a promissory note for that amount, payable one month after its date, was executed and delivered to the bank. This note was secured by a chattel mortgage in the sum of $1,300 covering machinery and equipment used in the business of the Sachs Company. The corporate obligations were reduced from time to time and on December 16th, 1946, the company was indebted to the bank in the sum of $4,800, represented by a note for $4,250 and a note for $550, both due on December 28th, 1946. The two chattel mortgages were still open of record. On December 20th, 1946, the corporation borrowed an additional $900, giving to the bank a promissory note in that amount payable on December 27th, 1946. None of the notes were met at maturity and they were promptly protested.
By this time the Sachs Shoe Manufacturing Company was hopelessly insolvent. The bank was threatening the foreclosure *Page 354 
of the chattel mortgages. Sachs, desiring to save something from the wreck, appealed to two friends, Alexander Wasserman and Michael Simons. They agreed to help save the business for Sachs. The plan was a simple one frequently used in similar situations, however doubtful its morality. Simons and Wasserman were to take over the obligations held by the Franklin Trust Company and obtain assignments of the chattel mortgages. The chattel mortgages would be foreclosed, the unsecured creditors wiped out and Sachs would then be in a position to operate his business without the burden of his liabilities.
Sachs took Simons to his attorney, Sidney Alexander, and outlined the situation to him. Alexander and Simons went to the register's office and examined the chattel mortgages. Alexander then made an appointment with Charles Roemer, attorney for the bank, to discuss the matter.
Up to that point the testimony was not conflicting. The stories of Mr. Roemer and Mr. Alexander as to what transpired at the meeting or meetings in the bank are irreconcilable. Roemer says that there were two meetings. Alexander says that there was one. Alexander testified that he was only interested in the purchase of the mortgages, and asked Roemer what was due on them. He says that Roemer told him that $5,031.70, the entire amount of the indebtedness, was due on the mortgages. Roemer denied that he discussed the amounts due on the mortgages. He was only interested in the total amount owed to the bank and was not concerned as to how much of the indebtedness was covered by the mortgages. Sachs and Simons testified that Roemer said the whole amount was due on the mortgages, corroborating Alexander. Two officers of the bank, corroborating Roemer, testified that he did not discuss what was due on the mortgages. They said that Roemer only mentioned the total indebtedness of the Sachs Company to the bank.
I am of the opinion that Mr. Roemer's recollection of what transpired is the more accurate one. There would be no point in his discussing anything other than the total obligation owed the bank. Mr. Alexander, according to his own testimony, told Roemer that the corporation was hopelessly *Page 355 
insolvent. Alexander also disclosed the plan to obtain the machinery for Sachs by the foreclosure of the mortgages. Certainly Roemer would not permit the bank to surrender its security without the payment of the total obligation. Alexander knew this. And he also knew that the success of the plan to help Sachs depended on their success in securing control of the chattel mortgages.
I am at a loss to understand how Sachs, Simons and Alexander could have been under any misapprehension as to the true situation. Sachs, of course, knew that he had signed three notes and that only two of them were secured by mortgages. He said that he assumed that the $900 note was secured by the mortgages but admitted that he had signed no mortgage when he executed the note. He further testified that when he received the protest notices on the three notes, he took them to Alexander and asked him what should be done about them. And Alexander and Simons went to the register's office to examine the chattel mortgages. So they, too, were aware that the mortgages were given to secure two, not three, notes.
On the day of the closing, which all agree was January 10th, Alexander, Sachs and Simons appeared at Roemer's office. Alexander had with him assignments of the mortgages. Alexander at first denied having prepared the assignments but later admitted that perhaps he had been mistaken. He insisted, however, that the amount of the consideration was inserted in the assignments in Roemer's office. This was denied by Roemer. The consideration of $553.93 for one of the assignments represented the amount due on the mortgage. The stated consideration of $4,477.87 for the other assignment represented the amount due on the mortgage plus the amount due on the unsecured note. When the consideration was inserted and why, in one instance it was misstated, I do not know, however much I may suspect the reason. But in view of the testimony, I must conclude that it was done in Alexander's office.
The point is not important. When the time for closing arrived, Simons gave his check for $5,031.70, the amount due on the Sachs notes. The check was not certified and *Page 356 
the bank refused to surrender the securities until a certification was obtained. Accordingly an escrow receipt was signed by the bank. This escrow agreement set forth the exact nature of the transaction. It listed the chattel mortgages and the notes. The escrow receipt was given to Alexander and his clients. The next day, when the check had been certified, the mortgages and notes were delivered at Alexander's office and the receipt was returned to the bank.
Mr. Alexander testified that he did not read the escrow receipt at the time of the closing. This statement I am unable to credit. His memory must be faulty. One of his clients had just parted with a check for $5,031.70. He had nothing to show for it other than the receipt. Failure of the attorney to satisfy himself that the receipt set forth the details of the transaction would have been negligence of the grossest kind. I cannot believe that an attorney of Alexander's experience would not have taken such an elementary precaution. Alexander also testified that he did not examine the notes because he was out of town when the notes were delivered. An examination of the notes would have told him only what he already knew. His client, Sachs, had told him about the three notes and had shown to him the protest notices. The examination of the chattel mortgages disclosed that they secured only two notes. And the escrow receipt set forth two mortgages and three notes.
The bill charges that Simons, Sachs and Alexander were induced to purchase the mortgages and notes by reason of the fraudulent representations made to them by Roemer. Fraud is a fact that will never be presumed but must always be clearly and convincingly proved. Pahy v. Pahy, 107 N.J. Eq. 538. I am unable to find from the testimony that, in fact, any fraudulent representations were made. Roemer and the bank officials would have been extremely foolish to make false statements and simultaneously with the making of the representations, hand to the other parties a document which would establish the falsity of the statements. Alexander and his clients, when they received the escrow agreement, were in possession of all the true facts. They will not be permitted to cry fraud and misrepresentation when all they had *Page 357 
to do to protect themselves was to read the escrow agreement. 3Pom. Eq. Jur. 893. In addition, Alexander made an independent investigation. He went to the register's office and examined the chattel mortgages. That examination disclosed that but two notes were covered by the chattel mortgages. He knew from his client, Sachs, that there were three notes. The most elementary caution would require that he inquire about the status of the third note. If he failed to do so, he cannot complain that he was misled.Berger v. Harrison Improvement Co., 108 N.J. Eq. 558.
Though the point was not raised in the bill, the complainant argued that rescission should be granted on the ground of mistake. In a proper case equity will grant relief because of mistake, but where the mistake is that of only one of the parties it must be accompanied by a showing of such unconscientious conduct on the part of the other party as to amount to fraud.Forman v. Grant Lunch Corp., 113 N.J. Eq. 175; SimpsonPlumbing and Heating Co. v. Geschke, 76 N.J. Eq. 475. Such a showing was not made. And where the mistake is entirely due to the negligence of the mistaken party, equity will not usually intervene. At the time of the closing Simons, Sachs and Alexander had at their disposal all of the facts necessary to enable them to understand precisely what the transaction contemplated. If, because of indifference or negligence, they failed to take advantage of the information available to them they will not be heard to complain at this time. Collignan v. Collignan,52 N.J. Eq. 516; 1 Black, Rescission and Cancellation 128.
I will advise a decree dismissing the bill of complaint. *Page 358