35 N.J. Super. 270 (1955)
113 A.2d 848
RAYMOND TRAUTWEIN, PLAINTIFF,
v.
JAMES J. BOZZO AND MODESTA BOZZO, HIS WIFE, DEFENDANTS.
Superior Court of New Jersey, Chancery Division.
Decided April 27, 1955.
*272 Messrs. Powell and Davis, attorneys for plaintiff (Mr. James M. Davis, Jr., appearing).
Mr. Frederick H. Beals, attorney for defendants.
GOLDMANN, J.S.C.
Plaintiff seeks rescission of an agreement dated December 16, 1953 for the purchase of certain premises in Mt. Holly, New Jersey, known as the Imperial Hotel, together with the plenary retail consumption liquor license for said premises, for $50,000. In the alternative, he seeks damages for loss of the bargain because of misrepresentation concerning the amount of business being done weekly at or over the bars in the premises. Defendants deny any misrepresentation and claim they are entitled to the $5,000 down payment made at the time the agreement was executed by way of liquidated damages and, in the alternative, specific *273 performance of the agreement. By their counterclaim they demand damages because of a drop in the market value of the premises during the period between the agreement and February 16, 1954, when settlement was to take place. They also seek damages because plaintiff charged them with fraud.
Plaintiff claims that he was induced to enter into the agreement by reason of representations in an advertisement inserted by defendant James J. Bozzo in certain publications circulating among the New Jersey and Pennsylvania liquor trade, offering to sell the Mt. Holly premises for $75,000, $25,000 to be in cash and $50,000 by way of mortgage. Among other things, this advertisement stated that there was an "$1100 weekly bar business." Plaintiff testified that he owned and operated a small place in Philadelphia where he had a malt beverage license issued by the Pennsylvania Liquor Control Board. He had been connected with the liquor business for some 18 years. He stated that after seeing Bozzo's advertisement he visited the Mt. Holly premises near the close of November; the date so testified to appears to have been Wednesday, November 25, 1953. He spoke with Bozzo, but there was no serious discussion about buying the business. He visited the premises again on Wednesday, December 2, 1953 when he alleges he told Bozzo that the $1,100 figure was of interest to him. He admits that he saw a brown notebook  it was introduced in evidence and contained a record of daily bar receipts week by week, a page being devoted to each week, for the weeks ending June 15, 1953 to December 28, 1953  but claims he was given no more than a casual look at it. He asserts that Bozzo held on to the book and showed him only two pages where the weekly receipts totalled about $800, Bozzo offering the explanation that business had dropped off in these weeks because his son was in charge of the bar. Plaintiff does not allege that defendant withheld the book from him, but insists he did not take it into his hands.
Plaintiff further testified that he visited the hotel a third time on Wednesday, December 9. He says that he became a little "leery" of buying the place and told Bozzo he would *274 rather wait until after Christmas and check a bit. He was "leery" because he found the record book "too informal"; it was written in pencil and was "smeary," so that he wanted to look into the matter a little further. The next event was his receipt of a letter from Bozzo (plaintiff claims he can no longer find it) wherein he wrote he was very anxious to sell because of family trouble and business falling off. The letter mentioned a $50,000 sale price for the first time; on previous visits $60,000 had been discussed. The result was that plaintiff went to Mt. Holly on December 16 and executed the agreement in question, paying $5,000 down, the balance of the $50,000 purchase price to be paid at settlement as follows: $25,000 purchase money mortgage, plaintiff's $50,000 note payable in certain installments, and $15,000 cash. Plaintiff said he purchased because the price had dropped $10,000.
The agreement fixed February 16, 1954 as the date of settlement at the office of defendants' attorney, time being made of the essence. Paragraph 13, as amended by the pretrial order, provided:
"Buyer agrees to apply within 10 days for transfer of Malt Beverage license to wife in Pa. If such transfer is not approved without fault of applicant and buyer is disqualified from N.J. Liquor License then this contract is void and deposit made hereunder to be returned. Buyer further agrees to apply for New Jersey Liquor License transfer within ten days after approval of hereinbefore mentioned Pennsylvania Malt License transfer."
On December 23, 1950, a week after the execution of the agreement, plaintiff says he went to Mt. Holly and told defendants his wife would not take the transfer of the Pennsylvania license and he asked that his $5,000 be refunded. Bozzo refused to do so. According to plaintiff he had had a representative of a surety company come to his Philadelphia place of business during the intervening week to arrange for the transfer application and the bond that had to accompany it. His wife had refused to sign, so that he was unable to apply for the transfer. He claims that he had asked her to reconsider her decision more than once because he stood to lose *275 his $5,000 deposit, and that her reply was that he "should have thought of it before this."
Plaintiff did not testify that Bozzo had at any time during their discussions expressly represented that the hotel was doing an $1,100 bar business. He claims that he relied upon the advertisement.
Defendant Bozzo's testimony contradicted plaintiff's in many significant respects. In the first place he says plaintiff first came to see him in Mt. Holly on November 4, 1953, and not three weeks later. This and the other visits about to be mentioned were corroborated. At that time plaintiff offered $45,000 and Bozzo demanded $65,000. Price was again discussed on plaintiff's visit to Mt. Holly on November 11. A similar discussion took place on a visit on November 18; on this occasion plaintiff asked to see the books of the business. Bozzo says he took plaintiff up to his apartment in the hotel and gave him the brown record book already referred to; that plaintiff looked through it page by page for about ten minutes and said "That looks good enough for me"; and that they then went downstairs where he showed plaintiff another book (this one with a blue cover, admitted in evidence), which listed daily and weekly receipts for the weeks ending March 16 to June 8, 1953. Further discussions were held at Mt. Holly on November 25 and December 2, 1953. When plaintiff visited on December 9, Bozzo asked that he make a deposit or drop the proposition. Plaintiff's reply was that he would buy after the holidays for $60,000, but could give only $20,000 in cash.
Defendant testified that he then wrote to plaintiff in Philadelphia stating he would sell for $50,000 and would like to hear from him by Tuesday. That date would be December 15. Plaintiff phoned and said he would come to Mt. Holly on Wednesday with the money. He did, bringing with him $20,000 in cash which he deposited in two banks. He then went to the office of defendants' attorney, and when the latter suggested he get his own attorney his reply was that he saw no need for additional expense. A regular sales agreement form was drawn up, executed, and the $5,000 downpayment *276 made. Bozzo then described how plaintiff came to the hotel on a later date and demanded his money back, shouting he would have defendants "sheriffed out," and inquiring in a loud voice whether Bozzo was a "man or a mouse."
Defendant also testified that he had visited plaintiff in his Philadelphia place of business near the end of November, at which time plaintiff commented upon the advertisement still being in the paper. Plaintiff's wife was there and was pleasant toward Bozzo. He denied that he at any time told plaintiff the bar was doing $1,100 weekly business.
Mention should also be made of the testimony of an accountant who examined defendants' records. He pointed to certain erasures and changes in the receipts for June 8 and 29, July 27, August 3, 10, 17 and 24, and September 7, 14 and 21, which increased the total receipts for those weeks by $100 or $200  $1,400 in all. The court has carefully examined these records and finds the changes were as testified to except for the June dates, where there are no changes, thereby reducing the total of the changes to $1,200. I consider Mrs. Bozzo's explanation of how these changes came about as satisfactory. It appears that the Bozzos had tried to sell their place at auction the day following election day in November 1953 and in order to make the sale more attractive the wife had, without her husband's knowledge or consent, made the indicated changes. The auction was not successful and the hotel was not sold.
A review of the records indicates that even with the changes, receipts exceeded $1,000 for only the four weeks ending March 16 and 30, April 6 and August 31, 1953. The second of these weeks was the only week when receipts exceeded $1,100, the figure being $1,145. The brown record book which Bozzo says plaintiff examined at length showed receipts as low as $673 and as high as $1,009.
The law applicable to the present situation has been restated so often as to require practically no citation. Deliberate misrepresentation of income from a business is a familiar category of fraud. Fraud is a fact that will never be presumed *277 but must always be clearly and convincingly proved. Wasserman v. Franklin Trust Co. of Paterson, 142 N.J. Eq. 352, 356 (Ch. 1948).
The rule is clear and has been consistently followed in our courts: in order to maintain an action based on fraud plaintiff must allege with reasonable certainty, and be prepared to prove, that defendant made some representation to plaintiff, meaning that he should act upon it; that such representation was false and defendant, when he made it, knew it to be false; and that plaintiff, believing such representation to be true, acted upon it and was thereby injured. Fischetto Paper Mill Supply, Inc., v. Quigley Co., Inc., 3 N.J. 149 (1949). A recent analysis of the cases dealing with false representations as to income, profits or productivity of property as fraud appears in 27 A.L.R.2d 14 (1953).
A false representation as to past or present rents, profits or income has often been held to constitute a sufficient basis for an action for rescission or damages based on fraud. The principle appears in the early cases of Wise v. Fuller, 29 N.J. Eq. 257, 262 (Ch. 1878), and Garrison v. Technic Electrical Works, 55 N.J. Eq. 708, 715 (Ch. 1897). To constitute fraud the facts misrepresented or concealed must be material facts which substantially affect the interests of the person alleged to be defrauded. It is generally held that the past or present rents, profits or income of the subject matter of a contract are material, or that representations concerning the matter are material. Berger v. Harrison Improvement Co., 108 N.J. Eq. 558 (Ch. 1931). One who, like plaintiff, buys a business is concerned primarily with the amount of net income that he will obtain from the property in the future, and the most important factor in his estimate of future net income is the amount of income the business has produced in the past. As one experienced in the liquor trade, plaintiff would know the percentage of markup or margin of profit, and from such facts quickly calculate the value of the business.
A statement as to the amount of past or present rents, profits or income, made in the form of a statement of fact, *278 is ordinarily treated as one of fact and not of opinion. A buyer is entitled to rely upon such a representation of fact made through newspapers or similar advertising media. Cf. Cline v. Kurzweil, 141 N.J. Eq. 508 (Ch. 1948), affirmed o.b. 1 N.J. 407 (1949). However, it must clearly appear that the person complaining of the misrepresentation in fact relied upon it, for if he did not do so he was not defrauded. Wise v. Fuller, above.
Most jurisdictions hold to the broad general rule that one to whom a positive and definite representation concerning an existing fact has been made is entitled to rely upon it and need not make inquiry concerning the particular fact involved. Berger v. Harrison Improvement Co., above; 23 Am. Jur., Fraud and Deceit, § 146, p. 949, § 161, p. 970. It has therefore often been held that the buyer of the business is entitled to rely on the seller's statement concerning its rents, profits or income. Some of the cases are collected in 27 A.L.R.2d, at page 41. However, where one to whom an allegedly false representation is made concerning such rents, profits or income makes an independent investigation to learn the truth, and relies on his own investigation rather than on the representation, he has no cause of action based on fraud. Berger v. Harrison Improvement Co., above. If the buyer knows, before executing the agreement of purchase and sale, that the seller has misrepresented to him the income of the subject matter of the sale, the buyer is not deceived and may not rescind the contract or recover for fraud.
As trier of the facts, the court had a first-hand opportunity to observe the witnesses and their manner of testifying, and to judge of their credibility. It cannot be said that the testimony was in equipoise  and that is the most that could be said for it under any circumstances, in which case plaintiff could not prevail because he would not clearly and convincingly have proved misrepresentation. I am convinced that plaintiff did examine the record of daily and weekly receipts for the period beginning with the second week in June and that he saw for himself that the business produced receipts far less than $1,100. He had also visited the place on six *279 successive Wednesdays preceding the execution of the contract. He was not young and inexperienced  one who could easily be overreached. Plaintiff had years of experience in the very field of business in which the transaction occurred. I conclude that aside from the advertisement, no representation of $1,100 a week bar business was made; that plaintiff was not in fact deceived; that he did not rely upon the advertisement in question, and that he decided to enter into the contract because he believed the price asked was a good one in the light of the receipt figures he saw. Cf. Greear v. Paust, 192 Minn. 287, 256 N.W. 190 (Sup. Ct. 1934); Rother v. Hiniker, 208 Minn. 405, 294 N.W. 644 (Sup. Ct. 1940).
Plaintiff argues that he is nonetheless entitled to a cancellation of the bargain and the return of the $5,000 payment because performance of the agreement is impossible if not illegal. We need not consider the question of illegality, which would require the court to resolve a complex of many factors: (1) the Pennsylvania requirement that a malt beverage license may be issued only to a reputable person who is a United States citizen and, on the application date, has for two years been a resident of the Commonwealth, Purdon's Penna. Stats. Ann., Title 47, § 4-432(b); (2) in Pennsylvania "residence" approximates domicile in meaning, Beretsky License, 68 Pa. Dist. & Co. R. 91, 92 (Pa. Cty. Ct. 1949); cf. Cheris' Appeal, 19 Pa. Dist. & Co. R. 629 (Pa. Cty. Ct. 1933); (3) the New Jersey requirement that no retail license shall issue to a natural person unless he is a United States citizen and a New Jersey resident at the time of his application, N.J.S.A. 33:1-25; (4) the question whether a wife could legally take a transfer of the Pennsylvania license on the basis of her being resident (domiciled) in Pennsylvania while her husband held the Mt. Holly license as a New Jersey resident, which involves a determination of whether the wife can have such a separate "residence" in view of the well-known rule that in law her domicile follows that of her husband (but see 10 N.J. Practice (Herr, Marriage, Divorce and Separation) (1950), § 63, pp. 68-69, and Rinaldi v. *280 Rinaldi, 94 N.J. Eq. 14, 18 (Ch. 1922); In re Geiser's Will, 82 N.J. Eq. 311, 313 (Prerog. 1913)). No case has been cited or found which deals with a similar situation or provides a guiding principle.
We need not consider the suggestion made by the attorney who testified for defendants as an expert on Pennsylvania liquor law that under the cited provision of Title 47, § 4-432(b), it would have been entirely proper to have formed a Pennsylvania corporation in which the wife held the controlling shares and to have transferred plaintiff's license to it. The agreement called for a transfer to the wife, not for a transfer to a corporation in possible circumvention of the law.
Was performance made impossible by the wife's refusal to take the transfer? The testimony did not throw much light upon the wife's role in the matter. She did not appear as a witness, and this is understandable in view of the fact that defendants and plaintiff stipulated in the pretrial conference as follows:
"* * * (5) On December 23, 1953, plaintiff informed defendant, James J. Bozzo, that he, the plaintiff, could not comply with the terms of the agreement, and requested a return of his deposit, which the defendant refused. (6) After the execution of the agreement declared upon, the plaintiff informed his wife that he had agreed to apply for a transfer of his Pennsylvania beverage license to her. The plaintiff's wife refused to receive a transfer of the said license, or to cooperate in any way with the transfer thereof."
Plaintiff's testimony that he had actually had a representative of the surety company come to his place of business to take care of the details of the transfer application and the necessary accompanying bond, and that his wife on that occasion refused to sign the application, was not controverted. Nor was his further testimony that he had after January 1, 1954 more than once asked her to reconsider because he stood to lose $5,000, her reply being that he "should have thought of it before this."
It would appear that plaintiff's wife had never been sympathetic toward the proposed purchase. According to plaintiff, he had mentioned he was interested in buying the Mt. Holly *281 hotel before he went there on his first visit, but had gotten no immediate reaction. After that visit she urged him not to be hasty, and after the second visit warned him to "be careful." Following the visit when, as detailed above, he had felt uneasy ("leery") about the purchase, his wife had told him that she was against the deal.
This is the only testimony about the part played by the wife that we have to go on. One may suspect that her refusal was a device which plaintiff and she used to allow him to get out of a regretted bargain. However, suspicion and surmise are no substitute for proof. Defendants admit as a fact that she was asked to join in the transfer application and refused.
The attorney witnesses who appeared for plaintiff and defendants, respectively, as experts on Pennsylvania liquor law, both testified that in Pennsylvania an effective application for transfer of a license requires three things: (1) an application by the holder of the license for its transfer to another; (2) the proposed transferee's separate application to have the license transferred to him; and (3) a surety bond of $2,000 guaranteeing that the transferee will observe the law. The wife's signature was not necessary to the husband's application under (1). However, the Pennsylvania Liquor Control Board would never have entertained plaintiff's application until items (2) and (3) had been submitted to it.
Defendants urge that plaintiff could at least have filed his own application for the transfer, and having failed to do so was in default of his obligation under the agreement and so should not succeed in this action. However, it is clear that such an application would have been a futility from the very start. The law will not require one to do a futile thing. What the parties contemplated here was an application, proper and complete in all its details, to have the license transferred to the wife, and not an application on behalf of the husband alone which would have been ineffective without the accompanying application of his wife and her bond.
It is to be noted in passing that the agreement of sale was prepared by defendants' attorney. True, plaintiff chose *282 to have this attorney represent him also, but in our view this does not defeat the principle that the agreement should be construed most strongly against the party preparing it.
Clearly, there could in the circumstances have been no transfer application, or transfer approved, plaintiff's wife being adamant in her stand that she would not sign an application form or cooperate in any way. Plaintiff is without fault and is entitled to the return of the $5,000 deposit.
Although this disposes of the complaint, it is appropriate to note plaintiff's alternative demand for damages for loss of the bargain. There can be no recovery for misrepresentation unless damage or injury resulted, and the burden was upon plaintiff to establish some pecuniary loss or injury as a natural consequence of defendants' alleged misrepresentation. Marsh v. Cook, 32 N.J. Eq. 262, 266 (Ch. 1880); 3 Pomeroy, Equity Jurisprudence (5th ed. 1941), § 898(a), p. 535. Plaintiff presented no testimony as to the value of the hotel, or that the agreed purchase price was less than the fair value of the property, or what the net return anticipated by him would have been. His claim for damages must fall.
Similarly, defendants offered no testimony as to the drop in the market value of the premises which, they claim, resulted in a loss to them when plaintiff failed to make settlement on the appointed day. Nor was there any proof of damages demanded under the counterclaim because of plaintiff's charge of fraud.
Accordingly, judgment will be entered in plaintiff's favor for the return of the $5,000 down payment on the purchase price. In the circumstances, he will not be allowed interest on this sum, or costs.